# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Jun 22, 2022
s/ D. Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information about the location of the cellular telephone assigned call number (414) 552-3389, known to be used by Calvin COLEMAN, whose wireless telephone service provider is T-Mobile | Case No. 22 MJ 114 |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 846 | Possession, distribution, and conspiracy to possess and distribute controlled substances. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

SEAN MAYERBOCK (Affiliate) *Digitally signed by SEAN MAYERBOCK (Affiliate)*
*Date: 2022.06.20 08:01:20 -05'00'*

*Applicant's signature*

DEA SA Sean Mayerbock

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 6/22/2022

*William E. Duffin*

*Judge's signature*

City and state: Milwaukee, Wisconsin     Honorable William E. Duffin, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Sean Mayerbock, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (414) 552-3389 and (hereinafter also referred to as "Target Cell Phone"), and known to be used by Calvin COLEMAN, whose wireless telephone service provider is T-Mobile ("Service Provider") headquartered at 3625 132nd Avenue Southeast, Bellevue, Washington 98006. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. I am a Police Officer with the City of Brookfield Police Department and have been a sworn law enforcement officer for 7 years. I am currently assigned to the North Central High Intensity Drug Trafficking Area (HIDTA) – Drug Gang Task Force. Since November 2019, I have been a Task Force Officer with the United States Department of Justice, Drug Enforcement Administration.

3. As a federal law enforcement officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency and other evidence of criminal activity.

4. As a narcotics investigator, I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. Furthermore, I have attended training courses which specialized in the investigation

1

of narcotics trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds

5.  This affidavit is based upon my personal knowledge and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to Case Agents. Case Agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

6.  Based the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Section 841(a)(1) and 846, have occurred. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of other individuals who are engaged in the commission of these offenses.

## PROBABLE CAUSE

7.  This investigation began in February 2020, when Case Agents met with a confidential source, herein referred to as "CS-1[1]", who provided information regarding suspects involved in drug trafficking in the Milwaukee, Wisconsin, area. CS-1 identified Michael BROWN as a mid-level dealer, who obtains heroin and cocaine from Gregory HAYES, who is a known large-scale distributor of heroin, cocaine, and marijuana in the Milwaukee area. CS-1

---

[1] Investigators believe CS-1 was a reliable person at the time of the CS-1's involvement in this investigation because CS-1 has provided information which law enforcement has been able to corroborate through independent investigations, CS-1 has provided statements against CS-1's own penal interests, and CS-1 has conducted controlled buys of narcotics for law enforcement. CS-1's adult criminal history includes three felony convictions. CS-1 was cooperating in exchange monetary value and was paid $500 each controlled buy. Since these controlled buys, the CS-1 had been arrested on two occasions for drug and firearms related offenses. The CS-1 was deactivated.

2

would contact Michael BROWN to purchase the heroin and cocaine from Gregory HAYES. CS-1 advised that the smallest amount of heroin that he/she could purchase would be 20 grams ($80 a gram) and 4 and 1/2 ounces of cocaine. Two controlled buys were conducted with CS-1 with associates of Gregory HAYES that provided the groundwork to further the investigation into the Gregory HAYES DTO.

8. Since the information about Gregory HAYES was obtained in February of 2020, Case Agents have conducted multiple controlled buys, for both cocaine and heroin, from multiple different suspects within the Gregory HAYES DTO (never from Gregory HAYES personally), multiple narcotics search warrants, hundreds of hours of surveillance, multiple "trap and trace" cell phone warrants, Administrative and Grand Jury Subpoenas, utilized various surveillance methods such as pole cameras, identified multiple suspects related to the Gregory HAYES DTO and have received reliable information pertaining to this DTO from multiple sources of information, all with the ultimate goal of identifying the hierarchy of the Gregory HAYES DTO. Through all of the investigative methods previously mentioned, Case Agents have developed a general understanding of the roles and leadership organization utilized within the Gregory HAYES DTO.

9. Gregory HAYES is the listed owner of Auto Source LLC., located at 7704 W. Appleton Ave., Milwaukee, WI and has been since August 27, 2019. Previously, Auto Source LLC., was titled Total Experience Car Care with the listed owner of Jamie UNDERWOOD. Through investigation into UNDERWOOD, investigators learned that UNDERWOOD's significant other was Calvin COLEMAN. COLEMAN is a felon who obtained a significant criminal history. COLEMAN has been arrested multiple times for narcotics and was sentenced to prison for 45 months for party to 2nd degree reckless homicide in 1997. Additionally, COLEMAN has been a target in multiple DEA cases that includes a federal indictment in the

3

Eastern District of Wisconsin in 2007, where he was sentenced in 2011 to 57 months in prison with 5 years of supervised release in a Conspiracy to Distribute Cocaine investigation. In this investigation, COLEMAN was identified as a kilogram level cocaine distributer. During COLEMAN's prior arrest he was also in possession of a firearm.

10. Throughout this investigation, COLEMAN has been a consistent top phone contact of Gregory HAYES. In the beginning of this investigation, HAYES utilized the phone number of (414) 526-9595. After a series of narcotics search warrants (connected to the HAYES DTO) were conducted in January 2021, HAYES dropped the (414) 526-9595 cell phone. Case Agents identified the phone number of (414) 544-0808 as HAYES new cell phone number. COLEMAN was a frequent caller of both of HAYES' identified phones. The numbers identified for COLEMAN throughout the investigation are (414) 888-2742, (414) 750-2243 and (414) 552-3389 (**TARGET CELL PHONE**).

11. On March 22, 2022, Case Agents obtained an administrative subpoena on the **TARGET CELL PHONE** from the date range of December 20, 2021, through March 21, 2022. The phone listed a customer and subscriber name of Total Experience Car Care (Title of Auto Shop owned by Jamie UNDERWOOD previously mentioned) with an address of 2373 N. 43rd Street, Milwaukee, WI 53216. According to law enforcement databases, the address of 2373 N. 43rd Street was previously associated to Calvin COLEMAN. A North Central HIDTA analyst created a frequency report with data obtained from the administrative subpoena. The top contact in this frequency report was Seconi Nicole Mathews using the phone number (414) 933-6379 with 574 contacts from December 20, 2021, through March 20, 2022. Additionally, a top contact with the **TARGET CELL PHONE** was Gregory HAYES' known cell phone number of (414) 544-0808. There were 174 contacts from December 20, 2021, through March 18, 2022.

12. On May 16, 2022, Case Agents were made aware by Washington County

4

Detective Jessie Williams that Jason DORZOK was arrested in Washington County. Detective Williams informed investigators that DORZOK was willing to provide Case Agents information pertaining to Gregory HAYES. Case Agents know that HAYES is also involved in Odometer fraud (rolling back or swapping odometers on vehicles and ultimately selling the vehicles) and the use of fake cashier's checks to purchase high valued vehicles (IE: Semi trucks, buses, dump trucks, motorcycles, conversion vans, Bentleys, etc.). Multiple jurisdictions throughout Wisconsin and Illinois have victims from both of these fraudulent schemes. An associate of HAYES, Edward YOUNGBLOOD was identified as a lead suspect working with HAYES on this fraudulent scheme. DORZOK was believed to have information on the fraud schemes conducted by HAYES and his associates.

13.     On May 17, 2022, Case Agents went to Washington County jail to interview DORZOK about the information he was willing to provide. DORZOK identified a photo of YOUNGBLOOD as "no neck (herein referred to as YOUNGBLOOD)." Case Agents asked DORZOK what Gregory HAYES and "no neck" were into. DORZOK indicated HAYES owns an auto shop on 76th and Appleton and that HAYES is able to obtain legitimate vehicle paperwork. DORZOK stated that YOUNGBLOOD and his associates have access to the fake cashiers' checks. DORZOK indicated that YOUNGBLOOD and his associates would identify a vehicle (primarily semi-trucks, dump trucks, and touring buses) and buy the vehicles with the fake cashiers' checks. DORZOK indicated that he would go with YOUNGBLOOD or his associates and usually drive the vehicles back. DORZOK stated that YOUNGBLOOD would be there on most of the transactions however, there were a few occasions where YOUNGBLOOD was not present.

14.     Case Agents inquired if DORZOK was ever a part of the transactions with the fake cashier's checks and DORZOK stated that he would sometimes take the cashier's checks if

they (referring to YOUNGBLOOD and his associates) were running late. Case Agents asked how many times DORZOK had any involvement in these illegal transactions and how long this had been going on. DORZOK stated that he didn't know how long it had been going on however, he got involved during the fall/winter timeframe of this past year.

15. Case Agents asked DORZOK how he met HAYES and DORZOK stated that he worked at HAYES auto shop as a mechanic. DORZOK was unable to remember the name of the shop but stated it was on 76th and Appleton and indicated that on one side of the shop is a motel and on the other side is an Auto Zone. DORZOK indicated that U-Haul was located across the street from the shop. Case Agents know that this was an accurate description of where Auto Source LLC is located.

16. Case Agents asked DORZOK when he got hired as a mechanic at Auto Source LLC and DORZOK stated that it was roughly October of this past year. Case Agents asked approximately how many times he helped on these illegal transactions for vehicles and DORZOK stated about 4 or 5 times. DORZOK indicated that these transactions were under the direction of both HAYES and YOUNGBLOOD. Case Agents asked DORZOK what type of payment he would receive for doing these transactions and DORZOK stated he would receive cocaine for his involvement. DORZOK stated that HAYES would provide him with a quarter pound of cocaine for every transaction and stated that it was roughly 100 grams of cocaine. DORZOK indicated the cocaine was in powder form.

17. Case Agents asked DORZOK who would give him the cocaine and he indicated HAYES would provide him with the cocaine every time and stated that HAYES was the one with the narcotics. Case Agents asked if DORZOK knew where HAYES kept the cocaine and DORZOK stated he believed HAYES keeps his narcotics at his house. DORZOK continued, saying that on one occasion HAYES had to grab the cocaine (the cocaine was not with him

6

while at Auto Source LLC) and was back to the shop in a few minutes. DORZOK stated HAYES residence was only a couple blocks from the shop. Investigators know this information is accurate as HAYES residence of 8018 W. Hope is in very close proximity to Auto Source LLC. Case Agents inquired about how much cocaine he received from HAYES from the time he started his employment at Auto Source LLC to the point he was arrested. DORZOK stated he believed about a pound of cocaine because it was at least four times that he was provided cocaine for his involvement in the illegal vehicle transactions.

18. Case Agents asked DORZOK if he ever received cocaine from HAYES unrelated to the illegal vehicle transactions and DORZOK stated that he would receive cocaine from HAYES on occasion. DORZOK stated that HAYES would on occasion "hook him up" with an "8-ball" of cocaine and would provide him with an "8-ball" of cocaine when DORZOK would help HAYES doing work on a vehicle. Investigators know that and "8-ball" is a term often used by narcotics dealers and users to describe 3.5 grams of narcotics (in this instance cocaine).

19. Case Agents asked DORZOK if he ever saw any narcotics transactions occur at Auto Source LLC and he stated he didn't however, he knew that they did do narcotics transactions at Auto Source LLC because in the office there are scales and baggies in the desk. DORZOK stated that it was only cocaine that he knew about. Case Agents inquired if DORZOK knew where HAYES obtained his cocaine from and DORZOK speculated that the previous owner of the auto shop (Calvin COLEMAN) was sourced with narcotics from a source out of Florida and that HAYES and previous owner may work together and go through the same source of supply. Case Agents asked if the previous owner and HAYES were associates and DORZOK stated they were. DORZOK stated the previous owners name was "Calvin." DORZOK stated that "Calvin" owns properties in Milwaukee and stated that "Calvin" and

7

HAYES still talk, and "Calvin" often shows up at Auto Source LLC. DORZOK described "Calvin" as older, skinny, and light-skinned. Case Agents showed DORZOK a photo of Calvin COLEMAN from TFO Mayerbock's phone and DORZOK positively identified Calvin COLEMAN as the previous owner of the auto shop and the same "Calvin" he was referring to. DORZOK indicated that he was close to COLEMAN and that he worked for him for a few years.

20. DORZAK informed Case Agents that COLEMAN still sells cocaine out of two properties. Additionally, COLEMAN sells heroin and pills. Case Agents asked DORZOK if he knew where COLEMAN's properties were and DORZOK stated 52nd Street and Hampton Ave is the property that COLEMAN is making narcotics sales out of and where COLEMAN is primarily at. DORZOK stated the property where COLEMAN keeps the bulk of his narcotics is located at 38th or 48th and North Ave., behind a gas station. DORZOK described the house on 38th or 48th and North Ave. as a white house separated from the gas station by an alley. DORZOK stated it is two-family duplex residence north of North Ave. DORZOK said the property may be in COLEMAN's uncle's name. DORZOK stated that the garage has a large hole from someone hitting it with their vehicle. Case Agents asked DORZOK if he thinks the residence on 38th or 48th and North Ave. is where COLEMAN is keeping his narcotics and DORZOK stated that he knew that was the residence COLEMAN keeps the narcotics at. Case Agents asked how he knew that and DORZOK stated that he has personally gone there to get narcotics and drop narcotics off.

21. DORZOK described the house on 52nd and Hampton Ave. He stated that it is on 52nd Street on the south side of Hampton Ave. He stated it was 2 or 3 houses away from Glendale Ave on the east side of the street. DORZOK stated the residence was a three-unit apartment that was partially brick and partially siding. DORZOK indicated that this was the

8

Case 2:22-mj-00114-WED    Filed 06/22/22    Page 9 of 20    Document 1

residence that COLEMAN serves narcotics out of. Case Agents asked DORZOK what the most amount of cocaine was that he personally has witnessed COLEMAN with, and DORZOK stated he has observed COLEMAN cooking a half kilo at a time. Case Agents asked what the most heroin was that he personally observed COLEMAN with and DORZOK stated, "I don't know how much I've seen of that, that was bricks and bricks and bricks." Investigators know that a "brick" is a common term utilized for a kilogram of narcotics. DORZOK stated that COLEMAN moves the heroin around quite a bit.

22. Case Agents asked DORZOK when the last time was that he received cocaine or heroin from COLEMAN. DORZOK stated, "The day before I got arrested." DORZOK was arrested in early May of 2022. Case Agents inquired if the narcotics he had on him at the time of his arrest were obtained from COLEMAN and DORZOK stated that some of those narcotics were indeed from COLEMAN. DORZOK stated it was fentanyl he received from COLEMAN however, he received narcotics from a couple different people that day (including COLEMAN) so he wasn't sure if it was the same narcotics he received from COLEMAN. DORZOK stated he obtained the narcotics from COLEMAN that he previously referenced from the house on 52nd and Hampton Ave. DORZOK stated he was the only one who knew about the house on 38th or 48th and North Ave. due to COLEMAN's trust in him.

23. Case Agents asked DORZOK if he believed COLEMAN was sourced by HAYES or if COLEMAN had his own operation. DORZOK stated he only knew that COLEMAN's narcotics are sourced from Florida and that it is a group of large black males that come to Wisconsin from Florida to conduct the narcotics transactions. DORZOK indicated that he saw the large black males from Florida on one occasion. Case Agents asked where it was that DORZOK saw this transaction and he stated it was in an O'Reilly's parking lot (272 E. Capitol Dr. Milwaukee, WI) that was located on the east side of the city on Capitol Dr. located by the

Walmart. DORZOK stated he had no part in the transaction however, happened to be at the O'Reilly's when the transaction occurred.

24. Case Agents asked DORZOK what kind of vehicle COLEMAN drives and he stated a white Ford 250 van, a white Chevrolet Avalanche, a tan Chevrolet Suburban, along with some other vehicles. Case Agents asked where it was that COLEMAN slept at night and DORZOK stated that he stays at all different spots and switches it up. DORZOK stated he knew COLEMAN had at least six properties that he would often switch between them. DORZOK stated that the two upper units of the 52nd Street residence are not involved however, COLEMAN utilizes the whole first level. DORZOK indicated that COLEMAN would keep the narcotics in the basement of the 52nd Street residence in storage closets.

25. DORZOK provided investigators with information on how COLEMAN conducted his narcotics dealings between the two residences he referenced prior in the interview. DORZOK stated COLEMAN would sell narcotics out of the 52nd Street residence and when he would run out of narcotics, he would go to the basement of the 52nd Street residence, grab more narcotics and "cook it up." DORZOK stated that when COLEMAN ran out of narcotics at the 52nd Street residence, COLEMAN would go to the residence at 38th or 48th and North and pick up more narcotics (location of the bulk of COLEMANs narcotics) and bring it back to the 52nd Street residence to distribute. Case Agents asked DORZOK if he knew where COLEMAN kept the narcotics stored in the North Ave residence, and he stated he knew he kept it on the lower floor or basement.

26. Case Agents asked DORZOK if he knew COLEMAN's phone number and DORZOK stated that he had his number in his phone, but he knew it was 414-888 however, did not know the last four digits. DORZOK stated COLEMAN had at least two phones. DORZOK stated the phone number that was not the "888" number was COLEMAN's narcotics phone that

he would coordinate narcotics transactions on. Case Agents know that during the course of this investigation, COLEMAN was utilizing the phone number of (414) 888-2742 which was observed multiple times on in phone tolls derived from HAYES known cell phone numbers.

27. On Wednesday, May 17, 2022, Case Agents attempted to locate the two locations that Calvin COLEMAN utilizes to distribute heroin, cocaine, and pills. Case Agents first attempted to locate the residence on 52nd Street and Hampton Ave. DORZOK described this residence as being on 52nd Street on the south side of Hampton Ave. He stated it was two or three houses away from Glendale Ave on the east side of the street. DORZOK stated the residence was a three-unit apartment that was partially brick and partially siding. Case Agents located the address of 4626 N. 52nd Street that fit the description that DORZOK provided. Case Agents were familiar with this address from the James SIMS investigation related to this same investigation.

28. On March 8, 2022, Case Agents were conducting surveillance on a grey Honda Odyssey that was being operated by SIMS. During the surveillance operations, surveillance officers observed SIMS travel to the 4626 N. 52nd Street residence. SIMS was observed parking on the street and entering the residence, being let in by an occupant. SIMS was observed leaving the 4626 N. 52nd Street residence a short time after. Investigators know that SIMS father, Sam SIMS, is a very close associate to Calvin COLEMAN. Both Sam SIMS and Calvin COLEMAN are related to Auto Source LLC that is operated by Gregory HAYES. Additionally, Sam SIMS and COLEMAN talk regularly based on phone tolls obtained by Case Agents. It also should be noted that James SIMS was arrested on April 19, 2022, across the street from 2012 N. Prospect Ave after he fled, on foot, out the front door of his residence. James SIMS was carrying a shoe box when he fled from the residence. The shoe box contained a plastic bag with approximately 308.70 grams of cocaine, gray grocery bag with approximately

11

376.5 grams of cocaine, brown grocery bag / zip lock bag with approximately 495.0 grams of heroin, white grocery bag with approximately 136.3 grams of fentanyl, white grocery bag with approximately 75.2 grams of fentanyl, and a digital scale and box of sandwich baggies. During a search of the residence, two plastic baggies with approximately 4.5 grams and 1.2 grams of cocaine, four plastic baggies with approximately 5.63 grams, 6.27 grams, 3.68 grams, and 1.45 grams of heroin/fentanyl, a large amount of US Currency an assault rifle/pistol "ghost gun," a loaded semi-auto Bersa 9mm handgun, a gun case with a semi-auto SAR 9mm handgun with loose ammunition, money counter, cell phone having # 414-531-9911, two additional cell phones (one identified as the dope phone having # 414-322-7079 , and documents were located.

29. On May 17, 2022, Case Agents located the address of 2323 N. 37th Street that matched the description that DORZOK provided about the residence on 38th or 48th and North Ave. This residence was white in color located directly behind the Citgo gas station (3708 W. North Ave) separated by an alley. This residence is a duplex style residence and has a garage that exhibits a large hole from a vehicle hitting it. Case Agents observed a blue 2003 Saturn Vue parked in the parking slab associated to the 2323 N. 37th Street residence. The Saturn Vue listed WI registration of AJD-3805. This plate lists to Seconi Nicole MATHEWS.

30. On June 1, 2022, Case Agents obtained an administrative subpoena on the **TARGET CELL PHONE** from the date range of March 01, 2022, through June 01, 2022. The phone still listed a customer and subscriber name of Total Experience Car Care (Title of Auto Shop owned by Jamie UNDERWOOD previously mentioned) with an address of 2373 N. 43rd Street, Milwaukee, WI 53216. A North Central HIDTA analyst created a frequency report with data obtained from the administrative subpoena. The top contact in this frequency report was Seconi Nicole MATHEWS using the phone number (414) 933-6379 with 672 contacts from March 01, 2022, through May 31, 2022. Additionally, a top contact with the **TARGET CELL**

**PHONE** was Gregory HAYES' known cell phone number of (414) 544-0808. There were 112 contacts from March 1, 2022, through May 27, 2022.

31. Based upon my training and experience, I know that individuals involved in drug trafficking use their cellular telephones to contact other drug dealers and drug purchasers, and that information relating to their telephones may show the areas in which they are trafficking drugs and the individuals who they are contacting to sell or distribute the drugs. Based upon the facts in the affidavit, there is probable cause to believe that Calvin Coleman is engaging in the trafficking and distribution of controlled substances and is utilizing the telephone number (414) 552-3389 **(TARGET CELL PHONE)** to further these crimes.

## CONCLUSION

32. Based on all the forgoing, I submit that there is probable cause to believe that Calvin Coleman is engaged in the distribution of controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846. I further believe that evidence of this crime is likely to be found by tracking the location of the cellular telephone assigned call number (414) 552-3389 **(Target Cell Phone)**.

33. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II date provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone, or by triangulation on the device's signal

using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., faces of the towers) to which the telephone is connected. These towers are often a half-mile or mile apart, even in urban areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from the device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

34. Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available.

35. Based on my training and experience, I know that T-Mobile can collect cell-site data about the Target Cell Phone.

## AUTHORIZATION REQUEST

36. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

37. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

38. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may

be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

39. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

40. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

# ATTACHMENT A

## Property to Be Searched

Records and information associated with the cellular device assigned call number 414-552-3389 (referred to herein and in Attachment B as "Target Cell Phone"), that is in the custody or control of T-Mobile (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 3625 132nd Avenue Southeast, Bellevue, Washington 98006.

# ATTACHMENT B

## Particular Things to be Seized

**I.  Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period **April 1, 2022, to the present:**

   i. Names (including subscriber names, usernames, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long-distance telephone connection records;
   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;
   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received)

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

   i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

   ii. Source and destination telephone numbers;

   iii. Date, time, and duration of communication; and

   iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phone.

c. Information about the location of the Target Cell Phone for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

   i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or

control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of Title 21 U.S.C. § 841(a)(1) and 846 involving Calvin COLEMAN, or his coconspirators during the relevant time period.